UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 09-80004-CR-Middlebrooks/Johnson

18 U.S.C. § 371
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1346

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

MARY B. McCARTY,

              Defendant.

_____/



FILED by _____ D.C.

**JAN 0 9 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Information:

*The County, Local, and State Governments.*

1.  The Palm Beach County Board of County Commissioners ("BCC") was the legislative and policy-setting body of county government in Palm Beach County, in the Southern District of Florida. Seven commissioners were elected from single-member districts to staggered four-year terms to represent the entire county.

2.  Palm Beach County employed a county attorney, county administrator and county engineer. They, in turn, each supervised numerous lower-level staff who were charged with the responsibility of discharging their respective mandates and missions. Palm Beach County also

created an Office of Financial Management and Budget ("OFMB"), on whose staff was a debt manager.

3.    A significant portion of Palm Beach County's capital improvements, utility services, infrastructure, recreational funding, and land purchases was derived from monies generated through the issuance of municipal bonds.

4.    A Request for Proposal ("RFP") was a mechanism through which a governmental entity solicited persons or entities seeking to do business with it for a particular matter or type of matter. An RFP set forth specifically delineated and objective criteria for the selection of an applicant based on merit, whose ultimate selection was transparent to the citizenry.

5.    Each elected county commissioner selected bond underwriting firms who became part of a team of eligible bond underwriters who serviced Palm Beach County's municipal bond needs. This selection was accomplished without the use of transparently objective criteria, such as an RFP. The selected bond underwriting firm served at the discretion of a particular county commissioner, without contract, whose eligibility to serve as a bond underwriter could be terminated without cause by the commissioner who appointed them.

6.    The selection of any particular team of bond underwriting firms for any authorized public project which was to be funded by municipal bond revenues was based on motion by a county commissioner and confirmed by BCC vote.

7.    Palm Beach County had not created any Finance Committee or Selection Committee comprised of staff members or outside experts whose role would be to objectively, and with transparency, select eligible bond underwriting firms to serve on the bond underwriting team servicing Palm Beach County.

2

8.     Each county commissioner had available certain funds annually from gasoline tax revenues and recreational fund revenues to give to any entity or municipality at their discretion. These funds, totaling in excess of $1 million annually, were collectively known as "discretionary funds." Each individual commissioner's discretionary fund designation was approved by the BCC, and then managed by Palm Beach County's OFMB staff.

9.     The City of Delray Beach was a municipality located within Palm Beach County, which largely fell within the geographical limits of Palm Beach County District 4.

10.     Delray Beach has a city council form of government with five (5) elected commissioners, including a mayor, an appointed city manager, and an appointed city attorney. The city manager supervised, among other personnel, a finance director, a treasurer, and procurement personnel.

11.     The Delray Beach City Commission selected bond underwriting firms, bond counsel, an outside financial advisor, and a lobbyist.  The use of any particular bond underwriting firm was initially determined by Delray Beach staff, including the city manager, finance director and treasurer, and they made that selection without the use of any RFP or any other objective criteria which would be transparent to the citizens of Delray Beach.

12.     A significant part of the funding necessary for capital improvements as well as maintenance of some of the essential services to the citizens of Delray Beach, such as water and sewage, was derived from funds generated by the issuance of municipal bonds.

13.     One of the capital improvement projects the city commission of Delray Beach sought to fund through the issuance of municipal bonds was the Old School Square Park and Parking Garage.

3

14.     The City of Delray Beach received significant discretionary funding from the BCC, including funding designated by the BCC for the Old School Square Park and Parking Garage.

*Local ordinances and State of Florida statutes.*

15.     In or around 2003, Palm Beach County passed an ordinance which prohibited verbal contact between a county commissioner, its staff, and those companies bidding under an RFP to do business with Palm Beach County.  This ordinance, labeled "the cone of silence," prohibited such verbal contact regarding the matter under bid for the time period during which the proposals submitted were under consideration.

16.     The State of Florida enacted laws under Chapter 112 regarding, among other matters, statutes addressing voting conflicts and gift disclosures.  Those statutes set forth the reporting and filing requirements regarding those voting conflicts and gift disclosures for elected officials.

17.     Florida Statutes Chapter 286 prohibited public officials' private communications and meetings with each other concerning matters to be heard before the public board.  This statute, known as "the Sunshine Law," made such private meetings between public officials a crime.

18.     The Palm Beach County attorney has a staff member versed in those ordinances and statutes who was ready, willing, and able to give legal advice to the BCC regarding the requirements of Florida and local law.

*The Palm Beach County Housing Finance Authority.*

19.     The Palm Beach County Housing Finance Authority ("HFA") was created to assist individuals in home ownership through the sale of tax free revenue bonds and also to make low interest mortgage monies available for multi-family projects and thereby erase urban blight and dilapidation through a program of buying land and building affordable housing.  The monies

4

necessary to accomplish the HFA mission were derived, in large part, from the issuance of municipal bonds.

20.     Each county commissioner appointed a member to the HFA which Authority's existence, purpose, and mandate were set forth by Florida Statute and by Palm Beach County ordinance. Each appointed member served a 4-year term of office.

21.     The HFA Board selected bond underwriting firms, bond counsel, separate HFA legal counsel, an outside financial advisor, and an executive director.  The selection of the bond underwriting companies was not the result of any RFP or any other objectively delineated criteria.

22.     Palm Beach County ordinance required that each HFA-generated bond indebtedness be approved by the BCC.  Prior to such BCC approval, the HFA Board already approved the project to be funded and the underwriting firms involved in the bonds.

*The School Board of Palm Beach County.*

23.     The School Board of Palm Beach County ("PBCSB") administered the public school system of Palm Beach County.  The PBCSB was the fifth largest school system in Florida.  The PBCSB consisted of seven elected Board Members, who each served four year terms.  The PBCSB Members selected a superintendent and a Chief Financial Officer ("CFO"). The CFO supervised the financial aspects of the school system, which included school construction financing and procurement.  The PBCSB also employed a treasurer and procurement officer who reported to the CFO.

24.     Funding for the construction and maintenance of schools was derived, in large part, from the issuance of municipal bonds and taxes imposed on property owners.

5

25. The PBCSB created a separate Finance Committee, whose role was, in part, to evaluate potential bond underwriting firms and make recommendations to the elected Board Members. The Finance Committee consisted of outside financial experts and some staff members, including the treasurer. An attorney, known to the United States Attorney, served as the chairman of the PBCSB Finance Committee, and also served as bond counsel to various municipalities and authorities in Palm Beach County.

26. As part of its function, the PBCSB staff members would periodically issue an RFP to solicit potential bond underwriting firms whose ultimate selection was to be based on specifically delineated criteria.

27. The evaluation of the bond underwriting firm applicants was conducted by PBCSB staff, which evaluations and selections were subsequently reviewed by the Finance Committee, and then ultimately selected by the elected School Board members.

28. Once selected, the bond underwriting firms were part of a "team" whose presence and participation in the issuance and sales of municipal bonds was secured by a non-assignable written contract with the PBCSB.

*Municipal and Governmental Bonds.*

29. Necessary funding for capital improvements, maintenance of essential services, recreational opportunities for the citizenry, and the respective missions of Palm Beach County, Delray Beach, the Palm Beach County HFA, and the PBCSB were derived from the issuance and sale of municipal bonds.

30. The issuance of municipal bonds was a financial arrangement whereby the particular municipality or Authority could obtain ready cash from a bond underwriting firm, which essentially

6

served as a banker, and thereupon passed on that indebtedness through bonds to the general public, which indebtedness was secured by the full faith and credit, the capital assets, and the revenues of that municipality or Authority. In return, the bond buyers in the general public received significant tax benefits for those purchases.

31.     The bond underwriting firm's fee was computed as a percentage of the overall amount of the bond indebtedness undertaken. Neither the bond underwriting firm nor bond counsel, whose role was to give a legal opinion as to the validity of the bonds, received any compensation if the bond transaction failed to close or materialize. Individual employees of the bond underwriting firms received year-end financial bonuses, which bonuses were predicated, in part, on the performance and ability of the bond underwriting firm's employee to secure governmental and municipal clients for the issuance and sale of municipal bonds.

32.     A bond underwriting firm serving as part of a team of underwriters for a particular bond issuance, could serve as either a senior manager "book runner" or as a co-manager. Since a senior manager did considerably more work in a municipal bond transaction than a co-manager, an underwriting firm designated as a senior manager received a larger percentage of the profits generated from a transaction than did a co-manager. On occasion, two or more senior managers were designated as co-senior managers.

33.     During a portion of the time period covered by this Information, bond underwriting firms were permitted to employ consultants, who performed the function of lobbyists.

34.     Raymond James and Associates, Inc. ("Raymond James") was a bond underwriting firm headquartered in St. Petersburg, Florida. Raymond James had a published ethics policy and outside business activity policy governing the conduct of their bond underwriter employees.

7

35.     Raymond James served as a named underwriting firm to the Palm Beach County HFA beginning in or around March 1998. Raymond James also submitted a response to an RFP issued by the PBCSB in or around November 2001 and was selected to be a co-manager. A Raymond James municipal bond underwriter, known to the United States Attorney ("Underwriter 1"), signed as an authorized representative of Raymond James a non-assignable written contract with the PBCSB in or around December 2001, which contract term was for three years, renewable for two one year periods, at the option of the PBCSB. In or around December 2002, defendant MARY B. McCARTY, Palm Beach County Commissioner for District 4, replaced UBS Paine Webber with Raymond James as one of her appointed bond underwriting firms.

36.     Bear Stearns & Co., Inc. ("Bear Stearns") was a bond underwriting firm headquartered in New York, New York until it was absorbed by JPMorgan Chase & Co. in or around June 2008.

37.     Bear Stearns submitted a response to an RFP issued by the PBCSB in or around November 2001 but was not selected as one of the five bond underwriting firms to participate with the PBCSB. Nevertheless, at a public meeting in or around June 2002, the Finance Committee of the PBCSB recommended the assignment of Raymond James' co-manager underwriting contract with the PBCSB to Bear Stearns, with Lawrence Kevin McCarty ("Kevin McCarty") present at the meeting as the Bear Stearns representative. The PBCSB Members voted to approve that assignment on or about July 17, 2002.

38.     Morgan Stanley was a bond underwriting firm headquartered in New York, New York.

8

39.     Morgan Stanley was appointed as an eligible bond senior manager underwriting firm for Palm Beach County in or around October 2003 by defendant MARY B. McCARTY at the same time that co-conspirator Warren H. Newell, at the direction of defendant Mary B. McCarty, appointed Raymond James as his senior manager underwriting firm.

40.     UBS PaineWebber ("UBS") was a bond underwriting firm headquartered in New York, New York which was renamed UBS Financial Services, Inc. in or around 2003.

41.     Citigroup Global Markets, Inc. ("Citigroup"), formerly known as Salomon Smith Barney, was a bond underwriting firm headquartered in New York, New York.

42.     Public Financial Management, Inc. ("PFM") was a Philadelphia-based independent financial advisor whose clients included numerous municipalities and authorities, including Delray Beach and the PBCSB.  PFM also had offices in Orlando, Florida.

43.     Raymond James, Bear Stearns, Morgan Stanley, UBS, and Citigroup each dedicated significant efforts and resources to the solicitation, development, and engagement of various municipalities, counties, and Authorities in their endeavor to generate income from their sought-after participation in the issuance and sale of municipal bonds.

*The Agricultural Reserve.*

44.     In or around 1998, the BCC and the citizens of Palm Beach County voted on the issuance of a $150 million General Obligation bond whose purpose was to buy environmentally sensitive lands for preservation and also purchase large tracts of land within a defined geographical location in Palm Beach County, designated as the Agricultural Reserve, wherein large scale farming activities would be preserved and not be subject to further development.  Palm Beach County staff

and the BCC divided the bond allocation into two $75 million bonds, one issued in 1999 and the second in 2001.

45.     In order to effectuate this policy of the BCC, those designated lands in the Agricultural Reserve were bought with the monies generated by the $150 million bond initiative.

46.     The McMurrain family owned a 627 acre tract of land in the geographically-designated Agricultural Reserve. T.M., a person known to the United States Attorney, was a member of the McMurrain family who shared in the revenue generated by the sale of the McMurrain tract to Palm Beach County.

47.     In or around June 2000, the BCC voted to partner with the South Florida Water Management District ("SFWMD") in the purchase of the McMurrain tract, and in or around July 2000, gave the McMurrain family, including T.M., over $23 million in taxpayer money for their land in the Agricultural Reserve.

*Ocean Properties, Ltd.*

48.     Ocean Properties, Ltd. ("Ocean Properties") is a corporation with offices in New Hampshire and Delray Beach, Florida which owned and managed over 100 hotels throughout the United States. Ocean Properties is owned by a family known to the United States Attorney, which included M.W, a person known to the United States Attorney. T.M. was an executive vice president with Ocean Properties, responsible for many of the operations of the various hotels and the development of Sunset Key, including Sunset Key Guest Cottages, a luxury property owned by Ocean Properties located near Key West, Florida.

49.     Ocean Properties also constructed hotels, and developed a resort island located off of Key West, named Sunset Key, as well as port facilities, retail stores, and garages on Key West.

Sunset Key was developed by Ocean Properties as both single family residences and luxurious oceanfront cottages available for rental to the general public. Ocean Properties also owned a hotel in Key West held at various times under the Hilton and Westin flagship names.

50.     Ocean Properties also owned a Holiday Inn Resort and Marina in Key Largo, Florida; a Marriot Hotel in Hollywood Beach, Florida; and a Marriott Hotel, in Delray Beach, Florida, to name but a few of their owned and managed hotel properties.

*The Convention Center Hotel.*

51.     Palm Beach County built, developed and maintained a convention center located within the City of West Palm Beach. The BCC, as a policy matter, envisioned that a hotel was to be built adjacent to the Palm Beach County convention center to service and nationally advertise the convention center as an attractive location to hold business conventions.

52.     After years of failure to get the convention center hotel built, the BCC decided in late 2003 to issue an RFP, to be administered by county staff, to seek bidders to construct a convention center hotel, condominiums, and a parking garage, all of which were designed to service the convention center. The RFP provided for the donation of the land, worth over $10 million, as well as significant public financing to assist in this endeavor.

53.     The responses to the RFP were due on or about January 26, 2004. Ocean Properties was one of five initial respondents and bidders, one of which was disqualified by county staff. The other competitors were New York-based The Related Companies, L.P., the parent company of CityPlace Partners; Florida Realty; and Texas-based Faulkner USA. The BCC selected Ocean Properties as the winning bidder on or about June 1, 2004.

54.     Subsequent to the selection of Ocean Properties, numerous legal and design issues, as well as the contractual obligations regarding this project, brought the matter back before the BCC on numerous occasions for their consideration and vote.  During this time, staff regularly consulted with the elected officials as to the progress, or lack thereof, in this endeavor.  Further, City of West Palm Beach elected officials and staff were regularly involved in the convention center building process as the hotel site was within their geographical jurisdiction for permitting issues.  Also, the property taxes generated from the anticipated condominium sales were anticipated revenue for the citizens of West Palm Beach.

55.     On or about October 7, 2008, the BCC voted to terminate their contract with Ocean Properties for lack of performance.

*The Defendant.*

56.     In or around November 1990, November 1994, November 1998, November 2002, and November 2006, defendant MARY B. McCARTY was elected to separate four-year terms as a Palm Beach County Commissioner for District 4, which District included substantial portions of the municipality of Delray Beach.

57.     On or about November 8, 1990, defendant MARY B. McCARTY took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

58.     On or about November 9, 1994, defendant MARY B. McCARTY took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

59.     On or about November 9, 1998, defendant MARY B. McCARTY took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

60.     On or about November 6, 2002, defendant MARY B. McCARTY took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

61.     On or about November 7, 2006, defendant MARY B. McCARTY took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

62.     As a sworn public official, defendant MARY B. McCARTY had a legal and ethical responsibility to perform her duties free from fraud, self-enrichment and self-dealing.

*Other Individuals.*

63.     Lawrence Kevin McCarty ("Kevin McCarty"), the husband of defendant MARY B. McCARTY was, at various times, employed as a municipal bond underwriter for Raymond James and Bear Stearns.

64.     Beginning in or around March 2003 and continuing through in or around June 2007, Kevin McCarty served as an appointed public official as a Governing Board member with the SFWMD.

65.     Underwriter 1 was, during a time period covered by this Information, employed as a bond underwriter for Raymond James.

## COUNT 1
## (Conspiracy, (18 U.S.C. §§ 1341, 1343, 1346 and 371))

66.     The United States Attorney re-alleges and incorporates herein by reference the General Allegations Section of this Information.

67.     From an exact time unknown to the United States Attorney, but at least as early as in or around March 1998, and continuing through in or around October 2008, at Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### MARY B. McCARTY,

did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with Warren H. Newell, Underwriter 1, and with other persons, known and unknown to the United States Attorney, to commit an offense against the United States, that is, to knowingly and willfully devise a scheme and artifice to deprive the public of their intangible right to defendant MARY B. McCARTY's honest services, and, for the purpose of executing this scheme and artifice, to knowingly use, and cause to be used, the United States mails or private or commercial interstate carriers, and did knowingly cause to be transmitted in interstate and foreign commerce, by means of wire communications, certain signals and sounds, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.

### OBJECT OF THE CONSPIRACY

68.     It was the object of the conspiracy to unjustly enrich defendant MARY B. McCARTY and Kevin McCarty, and Underwriter 1, by utilizing MARY B. McCARTY's position of public trust to reap undisclosed and material financial benefits, opportunities, rewards, gratuities, and gifts, and thereby deprive the citizenry of defendant MARY B. McCARTY's duty of honest services by

14

utilizing her position of public trust to reward Mary B. McCarty's and Kevin McCarty's benefactors, including Underwriter 1, and to advance relationships in which she had a concealed financial interest, and to continue to conceal those financial interests and relationships.

## MANNER AND MEANS OF THE CONSPIRACY

69.     Defendant MARY B. McCARTY used her publicly-elected position of trust to vote on multiple bond awards to Raymond James, as a selected bond underwriter to the HFA, on multiple projects and occasions, without disclosing her and Kevin McCarty's material financial interests to the public.

70.     Defendant MARY B. McCARTY nominated and voted for Raymond James to be an underwriting firm for Palm Beach County without disclosing her and Kevin McCarty's true and material financial interests in that appointment.

71.     Underwriter 1 arranged for a transfer of Raymond James' bond underwriting business with the PBCSB to Kevin McCarty in the expectation and belief that Kevin McCarty would influence and utilize the public position of defendant MARY B. McCARTY to create business opportunities for Underwriter 1

72.     T.M., M.W., Ocean Properties, and others bestowed significant and material financial gratuities on multiple occasions to defendant MARY B. McCARTY and her co-conspirators, including co-conspirator Warren H. Newell, and others.  These gratuities were never reported by any public official, including defendant Mary B. McCarty, to the State of Florida.

73.     Defendant MARY B. McCARTY, along with co-conspirator Warren H. Newell, and others, used their elected positions of public trust to vote on multiple occasions to benefit T.M.,

M.W., and Ocean Properties without disclosing the material financial benefits bestowed by T.M., M.W., and Ocean Properties.

74.     In order to conceal her multiple tainted and illegal votes, defendant MARY B. McCARTY failed to file required proper gift disclosure forms with the State of Florida, failed to disclose the true nature of her financial interest in Kevin McCarty's bond underwriting business ventures, intentionally failed to file required State of Florida conflict forms, agreed with co-conspirator Warren H. Newell to intentionally ignore State disclosure requirements, and falsely reported to the public, including other county employees, the true nature of the material financial gratuities bestowed on her by T.M., M.W., and Ocean Properties.

75.     In order to conceal the multiple tainted and illegal votes by defendant MARY B. McCARTY, Kevin McCarty failed to file required proper gift disclosure forms with the State of Florida.

76.     Defendant MARY B. McCARTY made materially false statements to federal investigators regarding her true financial relationship with T.M., M.W., and Ocean Properties and the nature and extent of the material gratuities bestowed on her by T.M., M.W., and Ocean Properties.

## **OVERT ACTS**

In furtherance of the above-described conspiracy and to advance the objects thereof, the defendant committed one or more of the following overt acts, among others:

16

## The Municipal Bond Business

### The HFA and Palm Beach County

77.     After lobbying by Kevin McCarty and defendant MARY B. McCARTY, the HFA Board appointed Raymond James as one of its bond underwriting firms on or about March 30, 1998.

78.     On or about June 23, 1998, defendant MARY B. McCARTY, and the BCC, voted to approve a $8,600,000 HFA revenue bond for the Riverview House Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

79.     On or about June 23, 1998, defendant MARY B. McCARTY, and the BCC, voted to approve a $2,200,000 HFA revenue bond for the Congress Landing Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

80.     On or about December 1, 1998, defendant MARY B. McCARTY, and the BCC, voted to approve a $15,000,000 HFA revenue bond for the Lake Crystal Phase II Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

81.     On or about December 1, 1998, defendant MARY B. McCARTY, and the BCC, again voted to approve a $8,600,000 HFA revenue bond for the Riverview House Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

82.     On or about April 6, 1999, defendant MARY B. McCARTY, and the BCC, voted to approve HFA revenue bonds totaling $14,500,000 for the Lake Delray Apartment project in which

17

Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

83.     On or about June 8, 1999, defendant MARY B. McCARTY, and the BCC, voted to approve an additional $300,000 HFA revenue bond for the Lake Delray Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

84.     On or about December 7, 1999, defendant MARY B. McCARTY, and the BCC, voted to approve a $13,100,000 HFA revenue bond for the Saddlebrook Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

85.     On or about March 7, 2000, defendant MARY B. McCARTY, and the BCC, again voted to approve a $13,100,000 HFA revenue bond for the Saddlebrook Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

86.     On or about June 6, 2000, defendant MARY B. McCARTY, and the BCC, voted to approve a $3,400,000 HFA revenue bond for the Marina Bay Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

87.     On or about June 6, 2000, defendant MARY B. McCARTY, and the BCC, voted to approve a $75,000,000 HFA revenue refunding bond for single family homeowner projects in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

88.     On or about December 19, 2000, defendant MARY B. McCARTY, and the BCC, voted to approve a $6,904,000 HFA revenue bond for the Mallard's Landing Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

89.     On or about December 19, 2000, defendant MARY B. McCARTY, and the BCC, voted to approve a $9,100,000 HFA revenue bond for the Colony Park Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

90.     On or about December 19, 2000, defendant MARY B. McCARTY, and the BCC, voted to approve a $8,500,000 HFA revenue bond for the Pinnacle Palms Apartment project in which Raymond James served as a bond underwriter, without defendant Mary B. McCarty disclosing her and Kevin McCarty's financial interests in the matter.

91.     On or about February 27, 2001, defendant MARY B. McCARTY for the first time publicly abstained from voting during a BCC vote to approve an HFA revenue bond underwritten by Raymond James, yet failed to verbally describe the full nature of her conflict.

92.     On or about May 1, 2001, during a BCC meeting in which the agenda set forth required votes on HFA revenue bonds totaling $9,350,000 for the Pinnacle Palms Apartment project, $22,000,000 for the Emerald Bay Club Apartment project, and $30,000,000 for the single family homeowner revenue bond program, all of which involved Raymond James as a bond underwriter, defendant MARY B. McCARTY intentionally absented herself from that discussion in order to avoid publicly reporting her and Kevin McCarty's financial interests in the matter.

93.     On or about May 22, 2001, during a BCC meeting in which the agenda set forth a required vote on a $6,255,000 HFA revenue bond for the Country Lake Apartment project in which Raymond James served as a bond underwriter, defendant MARY B. McCARTY intentionally absented herself from that discussion in order to avoid publicly reporting her and Kevin McCarty's financial interests in the matter.

94.     On or about June 5, 2001, during a BCC meeting in which the agenda set forth required votes on three separate matters involving HFA revenue bonds totaling $9,800,000 for the Colony Park Apartment project and the designation of Raymond James as the lead bond underwriter, defendant MARY B. McCARTY intentionally absented herself from that discussion in order to avoid publicly reporting her and Kevin McCarty's financial interests in the matter.

**The PBCSB and Palm Beach County**

95.     In or around December 2001, Underwriter 1, an authorized representative of Raymond James, signed a non-assignable written contract to perform bond underwriting services with the PBCSB for three years, which contract could be extended by the PBCSB for two one year periods.

96.     In or around January 2002, Kevin McCarty left Raymond James to work as a Florida-based bond underwriter for Bear Stearns.

97.     Prior to May 2002, Kevin McCarty told his superiors at Bear Stearns that he was highly confident that he could land for Bear Stearns the PBCSB municipal bond business even though Bear Stearns was not selected in the December 2001 RFP to be on the PBCSB underwriting team.

98.     Prior to May 2002, Kevin McCarty sought unsuccessfully with PBCSB officials, known to the United States Attorney, to transfer Raymond James' business contract to Bear Stearns.

99.     Prior to May 2002, Underwriter 1 sought unsuccessfully with a PBCSB official, known to the United States Attorney, to transfer Raymond James' business contract with PBCSB to Bear Stearns.

100.    Prior to May 2002, Kevin McCarty and Underwriter 1 lobbied the chairman of the PBCSB Finance Committeee to approve the proposed transfer of bond business from Raymond James to Bear Stearns at the PBCSB.

101.    On or about May 3, 2002, Kevin McCarty caused Underwriter 1 to send a letter to PBCSB officials requesting that Raymond James resign from its contract with PBCSB in consideration of Bear Stearns being appointed to the PBCSB underwriting team.

102.    On or about June 4, 2002, Underwriter 1 wrote to a supervisor that Raymond James' request to resign and appoint Bear Stearns in its place would be appreciated by Kevin McCarty because Underwriter 1 "had done [his] part."

103.    On or about June 7, 2002, Kevin McCarty, as a representative of Bear Stearns, attended a PBCSB Finance Committeee meeting chaired by an attorney known to the United States Attorney, which Committee discussed and recommended that the request of Underwriter 1 to allow Raymond James to resign from its contractual obligations as a bond underwriter and appoint Bear Stearns in its stead be approved.

104.    On or about June 14, 2002, Underwriter 1 wrote a second letter to PBCSB officials and requested that Raymond James' December 2001 contract with the PBCSB be assigned to Bear Stearns.

105.    On or about August 1, 2002, Underwriter 1 wrote to his supervisor that Kevin McCarty discussed with Underwriter 1 Kevin McCarty's ability to obtain Raymond James business with Palm Beach County, a governmental entity at which Raymond James was not on the underwriting team, in appreciation of Raymond James' assignment of its contract to Bear Stearns, which assignment was approved by the PBCSB on or about July 17, 2002.

106.    In or around September 2002, Kevin McCarty caused the PBCSB to award Bear Stearns bond underwriting business on a $93,350,000 municipal bond.

107.    On or about November 15, 2002, Underwriter 1 wrote to his supervisor that he was meeting with Kevin McCarty to discuss Kevin McCarty's ability to obtain business at Palm Beach County for Raymond James as a bond underwriter.

108.    On or about December 16, 2002, Underwriter 1 wrote to his supervisor that he learned from Kevin McCarty that Raymond James would be appointed the following day as a Palm Beach County bond underwriting firm to replace UBS by defendant MARY B. McCARTY.

109.    Prior to December 17, 2002, Kevin McCarty caused defendant MARY B. McCARTY to use her position of public trust to appoint Raymond James as her bond underwriting firm due to Underwriter 1's prior agreement to transfer Raymond James' bond underwriting business contract with the PBCSB to Kevin McCarty and Bear Stearns.

110.    At a BCC meeting on or about December 17, 2002, defendant MARY B. McCARTY appointed Raymond James as her bond underwriting firm to replace UBS without disclosing the true nature of her and Kevin McCarty's financial interests in that appointment.

111.    In a December 20, 2002 e-mail to his supervisor, Underwriter 1 bragged about his ability to influence " a certain commissioner or two" in his anticipated bid to be appointed as a senior

manager bond underwriter for an upcoming approximate $90,000,000 Palm Beach County municipal bond.

112.     On or about February 4, 2003, defendant MARY B. McCARTY, and the BCC, voted to award Raymond James an underwriting position on a Palm Beach County municipal bond without disclosing her and Kevin McCarty's financial interest in that matter.

113.     On or about April 29, 2003, Underwriter 1 and defendant MARY B. McCARTY met with each other and with a Raymond James consultant known to the United States Attorney, for the purpose of discussing the award of Palm Beach County's upcoming approximate $94,000,000 municipal bond.

114.     On or about June 9, 2003, defendant MARY B. McCARTY and Underwriter 1 met with each other and with a Raymond James consultant known to the United States Attorney, for the purpose of discussing the award of Palm Beach County's upcoming approximate $94,000,000 municipal bond.

115.     On or about June 12, 2003, defendant MARY B. McCARTY and Underwriter 1 caused the PBCSB to award Bear Stearns a $60,865,000 municipal bond.

116.     On or about June 25, 2003, defendant MARY B. McCARTY and Underwriter 1 caused the PBCSB to award Bear Stearns a $124,295,000 municipal bond.

117.     On or about July 1, 2003, defendant MARY B. McCARTY voiced her strong support for, and voted for, Raymond James to receive a $94,000,000 Palm Beach County public improvement municipal bond without disclosing her and Kevin McCarty's financial interest in that matter.

118.    Prior to October 21, 2003, at a private meeting, defendant MARY B. McCARTY discussed with co-conspirator Warren H. Newell defendant Mary B. McCarty's desire to have Newell appoint Raymond James as his senior manager bond underwriter at an upcoming BCC meeting to be held on October 21, 2003.

119.    On or about October 21, 2003, co-conspirator Warren H. Newell appointed Raymond James as his senior manager bond underwriting firm for Palm Beach County municipal bonds.

120.    On or about January 5, 2004, defendant MARY B. McCARTY and Underwriter 1, caused an interstate e-mail communication to be sent from underwriter's counsel to Palm Beach County staff and Underwriter 1 regarding the $94,000,000 Palm Beach County public improvement municipal bond that Raymond James was appointed to participate in as a co-senior manager on July 1, 2003.

121.    On or about January 13, 2004, defendant MARY B. McCARTY and Underwriter 1, caused an interstate e-mail communication to be sent from representatives of Citigroup to Palm Beach County staff and Underwriter 1 regarding the $94,000,000 Palm Beach County public improvement municipal bond that Raymond James was appointed to participate in as a co-senior manager on July 1, 2003.

122.    On or about January 14, 2004, defendant MARY B. McCARTY and Underwriter 1, caused an interstate e-mail communication to be sent from underwriter's counsel to Palm Beach County staff and Underwriter 1 regarding the $94,000,000 Palm Beach County public improvement municipal bond that Raymond James was appointed to participate in as a co-senior manager on July 1, 2003.

123.    On or about January 20, 2004, defendant MARY B. McCARTY and Underwriter 1, caused an interstate e-mail communication to be sent from representatives of Citigroup to Palm Beach County staff and Underwriter 1 regarding the $94,000,000 Palm Beach County public improvement municipal bond that Raymond James was appointed to participate in as a co-senior manager on July 1, 2003.

124.    On or about January 23, 2004, defendant MARY B. McCARTY and Underwriter 1, caused an interstate e-mail communication to be sent from representatives of Citigroup to Palm Beach County staff and Underwriter 1 regarding the $94,000,000 Palm Beach County public improvement municipal bond that Raymond James was appointed to participate in as a co-senior manager on July 1, 2003.

125.    On or about January 28, 2004, defendant MARY B. McCARTY and Underwriter 1, caused the Palm Beach County staff to close on the $94,000,000 Palm Beach County public improvement municipal bond transaction with Raymond James as one of the senior managers.

126.    On or about January 28, 2004, defendant MARY B. McCARTY and Underwriter 1, caused an interstate e-mail communication to be sent from representatives of Citigroup to Palm Beach County staff and Underwriter 1 regarding the $94,000,000 Palm Beach County public improvement municipal bond that Raymond James was appointed to participate in as a co-senior manager on July 1, 2003.

127.    On or about April 8, 2004, defendant MARY B. McCARTY and Underwriter 1 caused the PBCSB to award Bear Stearns a $103,575,000 municipal bond.

128.    On or about November 4, 2004, the PBCSB sent a letter to Kevin McCarty at Bear Stearns and requested Kevin McCarty's agreement to extend his assigned contract with the PBCSB for an additional year.

129.    On or about November 8, 2004, Kevin McCarty caused Bear Stearns to send a letter to the PBCSB agreeing to the proposed one year extension of the assigned contract between Bear Stearns and the PBCSB.

130.    On or about December 17, 2004, after PBCSB approval on December 8, 2004, the PBCSB mailed a letter to Kevin McCarty at Bear Stearns and confirmed the extension of Bear Stearn's assigned contract with the PBCSB to perform bond underwriting services.

131.    On or about February 25, 2005, defendant MARY B. McCARTY and Underwriter 1 caused the PBCSB to award Bear Stearns a $124,630,000 municipal bond.

132.    On or about March 15, 2005, the BCC, including defendant MARY B. McCARTY, voted on a resolution authorizing an approximate $9,520,000 Palm Beach County municipal bond to refinance a Judicial Center Parking Facilities municipal bond to Raymond James as the senior manager underwriting firm.

133.    On or about May 3, 2005, the BCC, including defendant MARY B. McCARTY, voted on a resolution authorizing an approximate $20,000,000 municipal bond to refinance the 1996 stadium facility revenue bonds to Raymond James as the senior manager underwriting firm.

134.    On or about May 3, 2005, the BCC, including defendant MARY B. McCARTY, voted on a resolution authorizing an approximate $133,935,000 Palm Beach County municipal bond to acquire, construct, and equip the Scripps Research Institute to Raymond James as a co-managing underwriting firm.

135.    On or about May 17, 2005, the BCC, including defendant MARY B. McCARTY, voted on a resolution authorizing the approximate $25,000,000 Parks and Recreation General Obligation bond to Raymond James as a co-managing underwriting firm.

136.    On or about May 17, 2005, defendant MARY B. McCARTY and Underwriter 1, caused a letter to be mailed from bond counsel to the Roger Dean Stadium General Manager and Palm Beach County representatives regarding the refunding of the 1996 stadium facility revenue bond.

137.    On or about May 18, 2005, defendant MARY B. McCARTY and Underwriter 1, caused bond counsel to send an interstate e-mail communication to Raymond James and Palm Beach County representatives, and others, regarding the approximate $133,935,000 municipal bond to acquire, construct, and equip the Scripps Research Institute.

138.    On or about May 23, 2005, defendant MARY B. McCARTY and Underwriter 1, caused Raymond James representatives to send an interstate e-mail communication to Palm Beach County representatives and others regarding the $25,000,000 Parks and Recreation General Obligation municipal bond.

139.    On or about October 20, 2005, the PBCSB mailed a letter to Kevin McCarty at Bear Stearns and requested Kevin McCarty's agreement to extend his assigned contract with the PBCSB for an additional ninety days.

**Delray Beach and Palm Beach County**

140.    On or about September 25, 2002, a Delray Beach staff member communicated to their supervisor, who was a high ranking staff member of the City of Delray Beach, known to the United States Attorney (Delray Official 1"), that their prior contract for bond underwriting services

27

with Raymond James expired in November 2001 and that their "contact person" left Raymond James for Bear Stearns.

141.   On or about September 25, 2002, Kevin McCarty caused Delray Official 1 to recommend to the Delray Beach City Commission that they extend their previously expired contract with Raymond James and award it to Bear Stearns to cover two anticipated upcoming municipal bond refundings which would be handled by Bear Stearns. This contract was given by the city commission to Bear Stearns without an RFP and was set to expire after those two bond refunding transactions.

142.   In or around December 2002, Kevin McCarty caused the staff of Delray Beach to recommend to the Delray Beach City Commission to award a $15,685,000 bond to Bear Stearns without an RFP.

143.   In or around December 2002, Kevin McCarty caused the staff of Delray Beach to recommend to the Delray Beach City Commission to award a $15,020,000 bond to Bear Stearns without an RFP.

144.   In or around July 2003, Kevin McCarty caused the staff of Delray Beach to recommend to the Delray Beach City Commission to award a $11,670,000 bond to Bear Stearns without an RFP and without a contract.

145.   In or around January 2007, defendant MARY B. McCARTY communicated with Delray Official 1 as to how Delray Official 1 and the City of Delray Beach should spend the money she gave to them from her discretionary funds.

146.   On or about January 17, 2007, defendant MARY B. McCARTY and Kevin McCarty caused Delray Official 1 to send an interstate e-mail communication describing funds to be allocated

to Delray Beach by defendant Mary B. McCarty and her direction as to how those funds should be spent.

147.     On or about February 27, 2007, defendant MARY B. McCARTY caused $500,000 in her discretionary funding to be awarded to the City of Delray Beach for purposes of constructing the Old School Square Parking Garage.

148.     Prior to March 15, 2007, Kevin McCarty lobbied Delray Beach city officials, including elected officials, to have Bear Stearns awarded an anticipated upcoming municipal bond without any competitive bidding.

149.     On or about March 15, 2007, Delray Official 1 for the first time notified the elected Delray Beach city officials that an additional $40,000,000 bond backed by utility taxes was necessary to finish Delray Beach's capital improvements, including the construction of the Old School Square Parking Garage and Park Improvements.

150.     On or about March 19, 2007, defendant MARY B. McCARTY and Kevin McCarty caused PFM to mail a letter to City of Delray Beach advising them on the available options concerning how to proceed on the anticipated $40,000,000 utility tax municipal bond.

151.     On or about March 21, 2007, Delray Beach staff directed that the anticipated $40,000,000 utility tax bond be awarded to Kevin McCarty and Bear Stearns without the knowledge of the elected Delray Beach officials, without an RFP, and without a contract.

152.     On or about August 10, 2007, defendant MARY B. McCARTY and Kevin McCarty caused bond counsel for Delray Beach to send an interstate e-mail communication attaching documents relating to the $27,000,000 utility tax municipal bond awarded by Delray Beach staff to Kevin McCarty and Bear Stearns.

153.    On or about August 20, 2007, defendant MARY B. McCARTY and Kevin McCarty caused an interstate e-mail communication to be sent to Delray Beach officials justifying why Bear Stearns should be awarded the upcoming utility tax bond, which justification was requested by a citizen of Delray Beach from the elected city officials of Delray Beach and not from Bear Stearns.

154.    Prior to August 21, 2007, defendant MARY B. McCARTY lobbied certain Delray Beach city officials to award the upcoming utility tax bond to Kevin McCarty and Bear Stearns and told another citizen, known to the United States Attorney, who previously was an elected official with Delray Beach, to keep quiet regarding the bond issue.

155.    On or about August 21, 2007, Kevin McCarty caused the Delray Beach City Commission to award a bond not to exceed $27,000,000 secured by utility taxes to Bear Stearns, without an RFP, and without a contract.

156.    On or about September 7, 2007, Kevin McCarty caused Delray Beach officials to execute a bond purchase agreement between Delray Beach and Bear Stearns in an amount of $24,635,000.  This business resulted in revenues totaling $117,957 to Bear Stearns.

157.    On or about October 12, 2007, Kevin McCarty mailed a letter to a staff member of Delray Beach thanking the city staff for the award of the $24,635,000 utility tax municipal bond to Bear Stearns and enclosed a gift.

### The Convention Center Hotel

158.    On or about January 7, 1999, defendant MARY B. McCARTY, and the BCC, including co-conspirator Warren H. Newell, approved a referendum for a $150,000,000 municipal bond to fund the purchase of land designated as an Agricultural Reserve and environmentally sensitive land.

159.    After being approved by the public in or around March 1999, on or about May 18, 1999, defendant MARY B. McCARTY, and the BCC, including co-conspirator Warren H. Newell, approved the splitting of the $150,000,000 bond into two separate $75,000,000 bonds, one to be issued in 1999 and the second in 2001.

160.    On or about June 6, 2000, defendant MARY B. McCARTY, and the BCC, including co-conspirator Warren H. Newell, voted to purchase approximately 627 acres of land owned by T.M. and the McMurrain family in the Agricultural Reserve for $23,073,600, which funding was to be split between the SFWMD and Palm Beach County.

161.    Prior to July 2000, defendant MARY B. McCARTY and co-conspirator Warren H. Newell agreed in a private meeting to not disclose the significant and material gifts and gratuities they were receiving, and were going to receive, including gifts and gratuities from T.M., M.W., and Ocean Properties.

162.    On or about July 21, 2000, defendant MARY B. McCARTY, and the BCC, caused Palm Beach County to close on its $23,073,600 transaction with T.M. and the McMurrain family.

163.    In or around July 2000, co-conspirator Warren H. Newell accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging at Sunset Key Guest Cottages, in Key West, Florida.

164.    From on or about December 28, 2000, and continuing through on or about January 1, 2001, defendant MARY B. McCARTY and Kevin McCarty accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging at Sunset Key Guest Cottages, in Key West, Florida.

31

165.    On or about April 17, 2001, defendant MARY B. McCARTY, at a BCC meeting, which included co-conspirator Warren H. Newell, discussed selling a portion of the McMurrain tract to another individual, known to the United States Attorney, without disclosing their receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

166.    From on or about November 21, 2001, and continuing through on or about November 24, 2001, defendant MARY B. McCARTY and Kevin McCarty accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included arranged free lodging at Sunset Key Guest Cottages, in Key West, Florida.

167.    On or about February 26, 2002, defendant MARY B. McCARTY at a BCC meeting, which included co-conspirator Warren H. Newell, discussed Palm Beach County's agreement with the SFWMD in the purchase of the McMurrain property without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

168.    On or about December 2, 2003, defendant MARY B. McCARTY at a BCC meeting, which included co-conspirator Warren H. Newell, voted to authorize Palm Beach County staff to issue an RFP for the building of the convention center hotel.

169.    On or about January 3, 2004, defendant MARY B. McCARTY, and the BCC, caused Palm Beach County staff to issue RFP number 2004-01-RCH seeking bidders for the building of a convention center hotel, with responses due on January 26, 2004.

170.    On or about January 26, 2004, T.M., M.W., and Ocean Properties submitted a proposal in response to RFP number 2004-01-RFP to build the convention center hotel. There were a total of five proposals received, and one was eliminated by Palm Beach County staff as unresponsive.

171.    Prior to February 6, 2004, defendant MARY B. McCARTY made arrangements with T.M., M.W., and Ocean Properties to stay at the Sunset Key Guest Cottages for a party to be held at the Hilton Hotel in Key West, Florida.

172.    From on or about February 6, 2004, and continuing through on or about February 8, 2004, during a time period covered by the "cone of silence," defendant MARY B. McCARTY and Kevin McCarty accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included grossly discounted room rates not available to the general public, for their stay at Sunset Key Guest Cottages, in Key West, Florida.

173.    On or about February 28, 2004, defendant MARY B. McCARTY, and the BCC, caused City Place Partners to send an interstate facsimile communication to Palm Beach County staff regarding the convention center hotel project.

174.    On or about March 9, 2004, defendant MARY B. McCARTY, and the BCC, caused The Related Companies, L.P. to send an interstate facsimile communication to Palm Beach County staff regarding the convention center hotel project.

175.    On or about March 20, 2004, defendant MARY B. McCARTY, and the BCC, caused Ocean Properties to send an interstate facsimile communication to Palm Beach County staff regarding the convention center hotel project.

176.    On or about April 6, 2004, defendant MARY B. McCARTY, and the BCC, caused Faulkner USA to send an interstate facsimile communication to the BCC, including defendant Mary B. McCarty requesting a workshop on the convention center hotel project.

177.    On or about April 13, 2004, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, discussed and voted on the cancellation of the original

proposals and authorized a new RFP without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

178.    On or about April 23, 2004, defendant MARY B. McCARTY, and the BCC, caused Palm Beach County staff to send an interstate e-mail communication to the applicants for the convention center hotel project.

179.    On or about April 27, 2004, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a joint BCC meeting with City of West Palm Beach public officials discussed property tax issues related to the building of the convention center hotel and condominiums, which discussion was undertaken without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

180.    On or about April 27, 2004, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC workshop meeting, voted to reinstate the original proposals and sought the "best and final offers" from the four remaining competitors, one of which included Ocean Properties.  This action was taken without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

181.    On or about May 28, 2004, defendant MARY B. McCARTY, and the BCC, caused a Chicago-based consulting firm to send an interstate e-mail communication to Palm Beach County staff regarding the convention center hotel project.

182.    Prior to June 1, 2004, defendant MARY B. McCARTY and co-conspirator Warren H. Newell agreed in a private meeting to award the building of the convention center hotel to Ocean Properties.

183.    On or about June 1, 2004, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted to award the building of the convention center hotel to Ocean Properties without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

184.    On or about June 15, 2004, defendant MARY B. McCARTY, and the BCC, caused the Chicago-based independent consulting firm to send their final report regarding their applicant review and analysis on the convention center hotel project.

185.    On or about August 17, 2004, defendant MARY B. McCARTY, and the BCC, requested a report from Palm Beach County staff on the progress of their negotiations to obtain a contract with Ocean Properties to build the convention center hotel without disclosing her prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

186.    From on or about September 7, 2004, and continuing through on or about September 11, 2004, defendant MARY B. McCARTY accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging and amenities, including food, for multiple rooms at the Delray Beach Marriott, in Delray Beach, Florida.

187.    On or about March 1, 2005, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted to agree to discuss with the county attorney settlement strategies involving a lawsuit between City Place Partners and Palm Beach County. City Place Partners was a losing bidder to build the convention center hotel and had alleged in their lawsuit, among other things, that the selection of Ocean Properties was irregular and not in accordance with the RFP. This action was taken by defendant Mary B. McCarty without disclosing her prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

188. On or about March 15, 2005, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted to approve a lawsuit settlement agreement with City Place Partners, without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

189. From on or about March 20, 2005, and continuing through on or about March 21, 2005, co-conspirator Warren H. Newell accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging under T.M.'s name, and free amenities, including food, at the Sunset Key Guest Cottages, in Key West, Florida.

190. On or about April 5, 2005, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted to approve the selling of public bonds with regard to finance the cost of the property on which Ocean Properties was to build the convention center hotel without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

191. On or about April 19, 2005, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, approved a resolution authorizing a $10,500,000 municipal bond to finance the property on which Ocean Properties was to build the convention center hotel without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

192. From on or about June 24, 2005, and continuing through on or about June 26, 2005, co-conspirator Warren H. Newell accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging under T.M.'s name, at the Hilton Hotel, in Key West, Florida.

193.    On or about August 16, 2005, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted on the progress of contract negotiations between Palm Beach County and Ocean Properties to construct the convention center hotel without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

194.    On or about September 19, 2005, co-conspirator Warren H. Newell accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging at the Hollywood Beach Marriott Hotel, in Hollywood Beach, Florida.

195.    From on or November 1, 2005, and continuing through on or about November 4, 2005, defendant MARY B. McCARTY and a relative, known to the United States Attorney, accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included grossly discounted room rates not available to the general public for their stay at the Delray Beach Marriott, in Delray Beach, Florida.

196.    On or about January 24, 2006, defendant MARY B. McCARTY discussed with Palm Beach County staff the progress of Ocean Properties on the convention center hotel project.

197.    From on or about March 21, 2006, and continuing through on or about March 24, 2006, co-conspirator Warren H. Newell accepted significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included grossly discounted room rates for two rooms not available to the general public for his stay at the Holiday Inn Resort and Marina, in Key Largo, Florida.

198.    On or about April 18, 2006, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted to agree to the relocation of the parking garage with regard to the building of the convention center hotel by Ocean Properties and also voted to impose

an additional bed tax to fund the building of the hotel and parking garage. These actions were taken without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

199.    On or about November 18, 2006, defendant MARY B. McCARTY, and the BCC, caused an attorney representing Ocean Properties to send an interstate e-mail communication to Palm Beach County staff which communication contained a draft Developmental Agreement between Ocean Properties and Palm Beach County.

200.    On or about December 5, 2006, defendant MARY B. McCARTY, and the BCC, caused a Palm Beach County staff member to send an interstate communication to T.M., as a representative of Ocean Properties, which communication contained an update of the convention center hotel project.

201.    From on or about December 31, 2006, and continuing through on or about January 1, 2007, Kevin McCarty assisted an employee of Palm Beach County who worked with defendant MARY B. McCARTY, known to the United States Attorney, to receive significant and material undisclosed gifts and gratuities from T.M., M.W., and Ocean Properties, which included free lodging at the Delray Breach Marriott, in Delray Beach, Florida.

202.    On or about January 4, 2007, defendant MARY B. McCARTY, and the BCC, caused a Palm Beach County staff member to send an interstate communication to Ocean Properties personnel, including T.M., which communication contained convention center hotel documents, including a draft Residential Ground Lease Agreement between Ocean Properties and Palm Beach County.

203.    On or about April 6, 2007, defendant MARY B. McCARTY, and the BCC, caused an attorney representing Ocean Properties to send an interstate e-mail communication to Palm Beach County staff, which communication contained the final Residential Lease Memo, Hotel Lease Memo, County Deed, and Completion Guarantee Agreement between Ocean Properties and Palm Beach County.

204.    On or about April 6, 2007, defendant MARY B. McCARTY, and the BCC, caused an attorney representing Ocean Properties to send an interstate e-mail communication to Palm Beach County staff, which communication contained the final Development Agreement between Ocean Properties and Palm Beach County.

205.    On or about April 10, 2007, defendant MARY B. McCARTY and co-conspirator Warren H. Newell, at a BCC meeting, voted to approve a written development agreement, hotel lease, residential land lease, and hotel room block agreement between Palm Beach County and Ocean Properties without disclosing their prior receipt of significant and material gifts and gratuities from T.M., M.W., and Ocean Properties.

206.    On or about January 4, 2008, defendant MARY B. McCARTY knowingly and intentionally made numerous materially false and incomplete statements to federal investigators regarding the circumstances surrounding her receipt of gifts and gratuities from persons or entities doing business with Palm Beach County, her stays at Ocean Properties hotels, and the rates that were paid.

207.    On or about January 7, 2008, defendant MARY B. McCARTY caused a Palm Beach County staff member to forward to defendant Mary B. McCarty a memorandum outlining a timeline of events related to the convention center hotel project.

39

208.    Beginning in or around January 2008, defendant MARY B. McCARTY knowingly and intentionally made numerous materially false and incomplete statements to a Palm Beach County staff member known to the United States Attorney, regarding the circumstances surrounding her stays at Ocean Properties hotels, the rates that were paid, and her receipts of gifts and gratuities from Ocean Properties.

209.    On or about September 19, 2008, defendant MARY B. McCARTY forwarded a memorandum directed to the Palm Beach County attorney in which defendant Mary B. McCarty knowingly and intentionally made materially false and incomplete statements regarding the circumstances surrounding her stays at Ocean Properties hotels, and the rates that she paid.

210.    On or about September 23, 2008, defendant MARY B. McCARTY, at a BCC meeting, knowingly and intentionally made materially false and incomplete statements regarding the circumstances surrounding her stays at Ocean Properties hotels, and the rates that she paid.

211.    On or about October 7, 2008, defendant MARY B. McCARTY, at a BCC meeting, knowingly and intentionally made materially false and incomplete statements regarding the circumstances surrounding her stays at Ocean Properties hotels, and the rates that she paid.

All in violation of Title 18, United States Code, Section 371.

## CRIMINAL FORFEITURE

Upon conviction of the violation alleged in this Information, the defendant,

## MARY B. McCARTY,

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violations including, but not limited to, the sum of $272,000 in United States currency.

40

Pursuant to Title 28, United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21, United States Code, Section 853.

If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

## MARY B. McCARTY,

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with a third person;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property and, in addition, to require said defendant to return any such property to the jurisdiction of the court for seizure and forfeiture, including, but not limited to:

a.     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1109 Vista Del Mar Drive North, Delray Beach, Florida, and more particularly described as:

Lot 5, less the East 32.50 feet thereof, and all of Lot 6, Delray Beach Esplande, according to the Plat thereof, recorded in Plat Book 18, Page 19, of the Public Records of Palm Beach County, Florida.

41

b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 343 Falls Bridge Road, Blue Hill Falls, Maine, 04614; and

c.    All interest in Northern Trust Bank account #5312000342 held in the names of defendants MARY B. McCARTY and LAWRENCE KEVIN McCARTY, as Mary B. McCarty and Kevin McCarty, respectively.

All pursuant to Title 28 United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21 United States Code, Section 853.


_____
R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY


_____
JOHN S. KASTRENAKES
ASSISTANT UNITED STATES ATTORNEY


_____
JULIA A. PAYLOR
ASSISTANT UNITED STATES ATTORNEY


_____
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY

42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

MARY B. McCARTY,

                **Defendant.**

_____/

CASE NO. *09-80004-CR-Middlebrooks/Johnson*

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

New Defendant(s)     Yes _____ No _____
Number of New Defendants
Total number of counts   _____

**Court Division**: (Select One)

____ Miami   ____ Key West
____ FTL   _X_ WPB   ____ FTP

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:   (Yes or No)   __No__
     List language and/or dialect   _____

4.   This case will take   _17_   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:
     (Check only one)                   (Check only one)

| | | | | |
|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | __17__ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | __X__ |
| V | 61 days and over | | | |

6.   Has this case been previously filed in this District Court? (Yes or No)   __No__
If yes:
Judge: _____   Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?   (Yes or No)   __No__
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)   __No__

7.   Does this case originate from a matter pending in the U.S. Attorney's Office prior to April 1, 2003? _____ Yes __X__ No

8.   Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? _____ Yes __X__ No
If yes, was it pending in the Central Region? _____ Yes _____ No

9.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

10.   Does this case originate from a matter pending in the Narcotics Section (Miami) prior to May 18, 2003? _____ Yes __X__ No

11.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____ Yes __No__ No

                               _____
                               JOHN S. KASTRENAKES
                               ASSISTANT UNITED STATES ATTORNEY
                               Florida Bar No. 312827

*Penalty Sheet(s) attached

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:   MARY  B.  McCARTY**

**Case No:** _09-80004-CR-Middlebrooks/Johnson_

Count #: 1

Conspiracy

18 U.S.C.  §§ 1341, 1343, 1346 and 371

**\* Max. Penalty:**   5 Years' Imprisonment, $250,000 Fine; 3 years supervised release

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _09-80004-CR-Middlebrooks/Johnson_

### BOND RECOMMENDATION

DEFENDANT: __MARY B. McCARTY__

__$200,000 Personal Surety__
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s): __FBI, IRS__
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

AO 455 (Rev. 5/85) Waiver of Indictment

# United States District Court

## SOUTHERN DISTRICT OF FLORIDA

### WAIVER OF INDICTMENT

UNITED STATES OF AMERICA

V.

CASE NUMBER: 09-80004-CR-middlebrooks/Johnson

MARY B. McCARTY,

I, __Mary B. McCarty_____, the above named defendant, who is

accused of conspiracy, in  violation of 18 United States Code, Sections 1341, 1343 , 1346, and 371.

being advised of the nature of the charge(s), the proposed information, and of my rights, hereby waive in open court on

_____ prosecution by indictment and consent that the proceeding may be by information rather than by indictment.
*Date*

_____
*Defendant*     MARY  B. McCARTY

_____
*Counsel for Defendant*

Before_____
*Judicial Officer*