```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,)   Case No.
                              )   09-80004-CR-MIDDLEBROOKS
 4           Plaintiff,        )
                              )
 5        -v-                  )
                              )
 6   MARY B. MCCARTY,          )
                              )
 7           Defendant.        )   West Palm Beach, Florida
                              )   March 27, 2009
 8   _____)   10:30 a.m.

 9

10                      PAGES 1 - 23

11              TRANSCRIPT OF PLEA PROCEEDINGS

12        BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS

13                  U.S. DISTRICT JUDGE

14

15   Appearances:

16

     For the Government:      JOHN KASTRENAKES
17                            STEPHEN CARLTON
                              JULIA PAYLOR
18                            Assistant United States Attorneys
                              500 Australian Avenue, Suite 400
19                            West Palm Beach, Florida  33401

20   For the Defendant:       BOGENSCHUTZ & DUTKO
                              BY:  J. DAVID BOGENSCHUTZ, ESQ.
21                            600 South Andrews Avenue
                              Fort Lauderdale, Florida  33301
22

23
     Reporter:                Karl Shires, RPR
24   (561) 514-3728           Official Court Reporter
                              701 Clematis Street, Suite 258
25                            West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1              THE COURT:  Good morning.  Please be seated.
 2              This is the case of the United States versus Mary
 3    McCarty, Case No. 09-80004.
 4              Could I please have appearances?
 5              MR. KASTRENAKES:  Thank you.  Good morning, your
 6    Honor.  John Kastrenakes, Julia Paylor, and Stephen Carlton
 7    on behalf of the United States.  I would also like to
 8    recognize -- there's no room at counsel table -- Special
 9    Agent Sconzo of the FBI and Special Agent Lisa Klitz of the
10    IRS.
11              THE COURT:  Good morning.
12              MR. BOGENSCHUTZ:  Good morning, your Honor.  Dave
13    Bogenschutz on behalf of Mary B. McCarty who's present at
14    counsel table with me today.
15              THE COURT:  Good morning.  And this is set for a
16    change of plea?
17              MR. BOGENSCHUTZ:  It is, your Honor.
18              THE COURT:  And I've been given a plea agreement.
19    I note there is a waiver of indictment in the file.  That was
20    dealt with by the magistrate?
21              MR. BOGENSCHUTZ:  By the magistrate.
22              MR. KASTRENAKES:  Yes, it was, your Honor.
23              THE COURT:  So are we ready to proceed?
24              MR. BOGENSCHUTZ:  Yes, we are.
25              THE COURT:  You can stay there at counsel table.
```

1          Please administer the oath to Ms. McCarty.

2       (The Defendant was duly sworn.)

3          THE COURT:  Go ahead and have a seat if you would.

4          MR. BOGENSCHUTZ:  Thank you.

5          THE COURT:  Good morning, Ms. McCarty.  You're now

6   under oath.  If you answer falsely to any of my questions,

7   your answer could later be used against you in another

8   prosecution for perjury or for making a false statement.

9          Do you understand?

10          THE DEFENDANT:  I do.

11          THE COURT:  I'm going to ask you several questions.

12   The purpose of the questions is to make sure you've carefully

13   considered your decision to plead guilty in this case,

14   determine that you're competent to make the decision, that

15   you're aware of your rights, and that there is a reason for

16   you to plead guilty, that you did what the Government says

17   you did.

18          If you don't understand any of my questions, please

19   tell me.  If you want to stop at any point and speak with

20   your lawyer, you may do that.

21          Do you understand?

22          THE DEFENDANT:  Yes, I do, your Honor.

23          THE COURT:  How far did you go in school?

24          THE DEFENDANT:  Through college.  I have a

25   bachelor's.

1          THE COURT:  Have you ever been treated for any

2    mental illness?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  Have you been treated for addiction to

5    narcotics or alcohol?

6          THE DEFENDANT:  No, your Honor.

7          THE COURT:  Are you currently under the influence

8    of any drug or alcohol?

9          THE DEFENDANT:  No, your Honor.

10         THE COURT:  Are you taking any type of medication?

11         THE DEFENDANT:  I took a Xanax this morning.

12         THE COURT:  Has that interfered in any way with

13   your ability to talk to your lawyer, make decisions about

14   your case?

15         THE DEFENDANT:  No, your Honor.

16         THE COURT:  Have you reviewed the information, the

17   charges filed against you in the case, and have you discussed

18   the charges with your lawyer?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Are you satisfied with the

21   representation Mr. Bogenschutz has provided to you?

22         THE DEFENDANT:  Yes, I am.

23         THE COURT:  I've been given a plea agreement

24   between yourself and the Government.  Let me first ask you to

25   confirm, this is your signature on the agreement?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And before signing it did you review it

3     and discuss it with your lawyer?

4          THE DEFENDANT:  Yes, I did.

5          THE COURT:  Do you believe you understand it?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  I'm going to review aspects of it with

8     you.  And if you have any question about any part of it,

9     please tell me.

10          In Paragraph 1 you are agreeing to plead guilty to

11     the information.  The information charges you with a

12     conspiracy to commit honest services fraud, in violation of

13     federal law.

14          Do you understand you're agreeing to plead guilty

15     to that charge?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Under the law a conspiracy is a

18     partnership in criminal purposes.  To prove this charge the

19     Government must show that two or more persons came to a

20     mutual understanding to try to accomplish an unlawful plan,

21     that you knowingly -- that you knowing the unlawful purpose

22     of the plan willfully joined in it.

23          The essence of depriving another of the intangible

24     right of honest services is that public officials inherently

25     owe a duty to the public to act in the public's best

1    interest.  If a public official receives a personal benefit

2    from an undisclosed conflict of interest, the official has

3    defrauded the public of the official's honest services.  To

4    prove such a conspiracy the Government must prove you

5    knowingly agreed to device or participate in a scheme to

6    fraudulently deprive the public of the intangible right of

7    honest services as charged and that you did so willfully with

8    the intent to defraud.

9              Do you understand that?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  You have an excellent lawyer.  You've

12   talked about the crime and you understand fully the elements

13   of the crime?

14             THE DEFENDANT:  I do.

15             THE COURT:  The sentence in this case will be

16   imposed after consideration of the Federal Sentencing

17   Guidelines.  I'm obligated to calculate a sentence under the

18   advisory guidelines.  Usually a sentence falls within the

19   advisory guideline range.  I do have discretion to vary from

20   the guidelines up or down, but I must take the guidelines

21   into account as well as other laws passed by Congress related

22   to sentencing.  The Court has legal authority to sentence you

23   up to the maximum authorized by law for the offense to which

24   you're pleading guilty, and you won't be able to withdraw

25   your plea as a result of the sentence imposed.

1         Do you understand?

2         THE DEFENDANT:  I do.

3         THE COURT:  The possible penalties are in

4    Paragraph 3 of the agreement which indicates that you could

5    be sentenced to a term of imprisonment of up to five years.

6    Imprisonment would be followed by a term of supervised

7    release of up to three years.  In addition to imprisonment

8    and supervised release, a fine of up to $250,000 could be

9    ordered, forfeiture of assets as provided for in the plea

10   agreement, and restitution could also be ordered.

11        Do you understand these are the possible penalties

12   for this crime?

13        THE DEFENDANT:  I do, your Honor.

14        THE COURT:  Additionally, a special assessment of

15   $100 will be imposed payable at sentencing.

16        In Paragraph 7 there is an agreement between the

17   parties that both sides -- that nothing in the agreement

18   prevents either side from presenting factual information to

19   the Court or the probation office with respect to sentence.

20   In other words, there's not an agreement that you would

21   necessarily be sentenced within the sentencing guidelines.

22        Do you understand?

23        THE DEFENDANT:  I do, your Honor.

24        THE COURT:  There's also an agreement with the

25   Government that you profited in this case more than $200,000

1    but less than $400,000 as a result of the criminal conduct.

2            Do you understand that?

3            THE DEFENDANT:  I do, your Honor.

4            THE COURT:  In Paragraph 8 the Government agrees to

5    recommend your guidelines be reduced by three levels for

6    acceptance of responsibility.  The Government won't be

7    required to make that recommendation, however, if you fail to

8    make a full disclosure to the probation office of the

9    circumstances surrounding the offense, if you're found to

10   have misrepresented facts to the Government before entering

11   into this agreement, or if you commit any misconduct after

12   entering into the agreement.

13           Do you understand?

14           THE DEFENDANT:  I do, your Honor.

15           THE COURT:  In Paragraph 10 you've agreed to

16   forfeit to the Government $272,000 in cash.

17           And is that the total forfeiture, Mr. Kastrenakes?

18           MR. KASTRENAKES:  It is, your Honor.  And I would

19   also represent to the Court that my understanding is that

20   that money is in the escrow account of Mr. Richard Lubin who

21   represents Mrs. McCarty's husband.

22           THE COURT:  So that's already been placed in

23   escrow?

24           MR. KASTRENAKES:  Correct.

25           THE COURT:  And you've also agreed to execute any

```
 1    necessary documents in connection with that forfeiture.

 2              Do you understand?

 3              THE DEFENDANT:  Yes, sir.

 4              THE COURT:  Paragraph 12 is a very important part

 5    of your plea agreement, because under federal law you have a

 6    right to appeal the sentence imposed in this case.  However,

 7    as part of your plea agreement you're giving up your rights

 8    to appeal the sentence in this case unless it exceeds the

 9    maximum permitted by statute, which would be the five years.

10              Do you understand you're giving up your rights to

11    appeal the sentence in this case?

12              THE DEFENDANT:  I do, your Honor.

13              THE COURT:  The title mentions collateral appeals,

14    but the language doesn't affect it, does it?

15              MR. KASTRENAKES:  I'm sorry, your Honor?

16              THE COURT:  The title here talks about a collateral

17    appeal waiver, but I don't see the language that you usually

18    have as to collateral appeals.  Is that also part of the

19    agreement?

20              MR. KASTRENAKES:  I didn't draft this part of the

21    plea agreement, your Honor, but --

22              THE COURT:  This refers just to direct appeals.  Is

23    that your intent?

24              MR. KASTRENAKES:  That was my intent, yes.

25              THE COURT:  Okay.
```

```
 1              MR. KASTRENAKES:  Thank you.  Strike that.

 2              THE COURT:  All right.  Have you talked about that

 3    with your lawyer and are you satisfied with your decision in

 4    that regard?

 5              THE DEFENDANT:  Yes, sir.

 6              THE COURT:  Okay.  We've reviewed this written plea

 7    agreement.  Beyond this agreement has the Government made any

 8    promises to you in connection with your case?

 9              THE DEFENDANT:  No, it has not.

10              THE COURT:  Has anyone attempted to force you to

11    plead guilty?

12              THE DEFENDANT:  No, they have not.

13              THE COURT:  Are you pleading guilty of your own

14    free will because you are guilty?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  Do you understand you have a right to

17    plead not guilty?  If you plead not guilty, you have the

18    right to a trial by jury.  The Government would have to prove

19    your guilt beyond a reasonable doubt.  You would have the

20    right to the assistance of counsel.  Your lawyer could

21    cross-examine the witnesses called by the Government, present

22    witnesses on your behalf, you could either testify or choose

23    not to testify.  And if you decided not to testify, that fact

24    couldn't be used against you in the trial.

25              Do you understand you have those rights?
```

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  By pleading guilty you're giving up

 3     those rights and there will be no trial.

 4              Do you understand?

 5              THE DEFENDANT:  Yes, sir.

 6              THE COURT:  This crime is a felony.  If your plea

 7     is accepted, you will be adjudged guilty of a felony and may

 8     lose valuable civil rights such as the right to vote, the

 9     right to hold office, the right to own a firearm.

10              Do you understand?

11              THE DEFENDANT:  I do.

12              THE COURT:  I'm going to ask the prosecutor to

13     describe what he would have proven at trial had the case gone

14     to trial.  Please listen carefully.  When he finishes, I'm

15     going to ask you whether you did what the Government says you

16     did.

17              Mr. Kastrenakes.

18              MR. KASTRENAKES:  Do you want me to approach the

19     lectern, your Honor?

20              THE COURT:  Wherever you're comfortable.  That's

21     fine as long as you use the microphone.

22              MR. KASTRENAKES:  Yes, sir.

23              Forgive me for taking a few extra minutes on this,

24     your Honor.  The information was pretty lengthy.

25              The United States would prove the following at
```

1  trial beyond a reasonable doubt.  The defendant, Mary

2  McCarty, was an elected Palm Beach County Commissioner

3  beginning in approximately November 1990 and served through

4  January of 2008.  She was elected to multiple four-year terms

5  as a county commissioner.  The United States would prove at

6  least beginning in 1997 and continuing through 2008

7  essentially three schemes to deprive the public of her honest

8  services.

9        The first scheme, in a broad sense, was her

10  assistance of her husband Kevin McCarty, a bond underwriter

11  with two firms, Raymond James and Bear Stearns, to enhance

12  his business and thereby her income because Mr. McCarty's

13  business as a bond underwriter was rewarded by his firms on a

14  percentage basis of the business he brought in.

15        The second scheme was an involvement in failure to

16  disclose to her fellow county commissioners the awards that

17  she gave to the City of Delray Beach when Delray Beach had a

18  business relationship with her husband which was unknown by

19  her colleagues.

20        The third scheme involved her relationship with a

21  business known as Ocean Properties.  That business involved

22  the building of a convention center hotel here in Palm Beach

23  County in which she had a personal and business relationship

24  in the sense that they gave her multiple gratuities over the

25  course of approximately seven or eight years.

1        The United States would prove the following with

2   respect to each of those schemes.  On the first scheme that I

3   mentioned, your Honor, as I indicated, Mr. McCarty who was

4   the defendant's husband is a bond underwriter.  In 1997 he

5   was a bond underwriter with a firm based out of

6   St. Petersburg known as Raymond James and Associates.  In

7   1997 Mr. McCarty lobbied the Housing Finance Authority of

8   Palm Beach County to be added to their list of bond

9   underwriters.  The Housing Finance Authority for Palm Beach

10  County was an entity here and is an entity here in Palm Beach

11  County created to assist poor individuals in home ownership

12  as well as through the sale of tax-free revenue bonds.  Those

13  moneys were derived in large part from the issuance of

14  municipal bonds.  Each county commissioner, including the

15  defendant, appointed members of that board which authorities,

16  purpose, and existence and mandate were set forth by Florida

17  Statute in Palm Beach County Ordinance.  Once the Board

18  issued a bond, that bond would go back to the County

19  Commission for approval.

20        After Mr. McCarty was added to the Housing Finance

21  rotation, actually along with two other firms to issue the

22  bonds, the United States would prove that each bond from 1997

23  forward to at least 2001 were brought back before the County

24  Commission.  On at least ten separate occasions Defendant

25  McCarty voted to approve the bonds and the awards to Raymond

1    James without disclosing that she had a personal financial

2    interest in those bonds; in fact, that her husband was making

3    money from those awards, and that she personally profited

4    because their money was shared with each other.

5            Subsequently after those votes, the United States

6    would prove that Palm Beach County had a unique system of

7    awarding municipal bonds for the County.  That was that there

8    was not a request for proposal.  That, in fact, each county

9    commissioner through their discretion could award -- could

10   nominate a particular bond underwriter to be the bond

11   underwriter on a rotation basis.  That was done without a

12   contract and at the total discretion of each individual

13   county commissioner.

14           The Palm Beach County School Board also issued

15   bonds which was done through an RFP and awards.  In December

16   of 2001 Palm Beach County School Board awarded for the next

17   three years a rotation that included Raymond James and

18   Associates but did not include Bear Stearns; in other words,

19   Bear Stearns had applied, Raymond James had applied, and the

20   Palm Beach County School Board awarded the business to

21   Raymond James and other firms.

22           In January of 2002 Kevin McCarty left Raymond James

23   and went to Bear Stearns.  When he went to Bear Stearns, he

24   actively sought to get that contract reassigned to Bear

25   Stearns.  During the course of the spring of 2002 Arthur

1    Ziev, who was a Raymond James bond underwriter, agreed to

2    lobby the Palm Beach County School Board as well as other

3    individuals on the Finance Committee for Palm Beach County

4    School Board to transfer their contract, that is, Raymond

5    James' contract, to Bear Stearns to benefit Kevin McCarty.

6    That was accomplished in the summer of 2002.

7              Subsequent to that, Kevin McCarty then sought to

8    assist Raymond James in being put on the County rotation.  In

9    fact, in December of 2002 Mary McCarty awarded and gave

10   County business, bond underwriting business to Raymond James

11   and put them on as her bond underwriter.  At the time that

12   she did that she failed to disclose to the public as well as

13   to her fellow county commissioners of the relationship and

14   the transfer of business between Arthur Ziev and Kevin

15   McCarty that had occurred earlier that same year.

16             Subsequently after January of 2003, Commissioner

17   McCarty voted on multiple occasions on multiple projects,

18   including the Scripps project, including other projects that

19   were important to Palm Beach County in which Raymond James

20   and Associates got a piece of the bond work.  She failed to

21   disclose that, in fact, she had a financial interest in that

22   award to Raymond James.  And that is because her husband,

23   because of Raymond James' intercession, had received business

24   with the Palm Beach County School Board.

25             The second broad scheme that I had discussed, your

1    Honor, was a relationship that the McCarty family enjoyed

2    with the City of Delray Beach.  Commissioner McCarty had been

3    a city commissioner prior to becoming a county commissioner

4    with the City of Delray Beach and has resided in Delray Beach

5    for a number of years.  Beginning in the mid 1990s the City

6    of Delray Beach began to award in a unilateral way business

7    to Kevin McCarty.  Depending on whatever firm Kevin McCarty

8    was with, the City of Delray Beach gave their bond business

9    directly to that firm whether it be Raymond James or Bear

10   Stearns when he switched over to Bear Stearns.

11        Commissioner McCarty knew that and Commissioner

12   McCarty over the years had, as all commissioners did,

13   discretionary funds allotted to her on an annual basis

14   whether they be for transportation issues or recreation

15   purposes.  Commissioner McCarty would award that money to

16   various municipalities within her district, including Delray

17   Beach.  When she made those awards, she failed to disclose to

18   her fellow county commissioners that her husband enjoyed this

19   relationship with the City of Delray Beach that financially

20   bettered their family.  In fact, whenever you make an award,

21   although it's a proforma thing, each county commissioner

22   votes and usually approves the particular county

23   commissioner's award of this discretionary money.

24        The third broad scheme involves Mrs. McCarty's

25   relationship with a company called Ocean Properties.  Ocean

1  Properties is a corporation with offices in New Hampshire and

2  Delray Beach, owned and managed more than 100 hotels here and

3  throughout the United States.  It is a family-owned business.

4  That business has built hotels throughout Palm Beach County,

5  manages hotels throughout Palm Beach County, also Broward

6  County and also Monroe County.  In Monroe County they

7  developed Sunset Key, including Sunset Key Guest Cottages

8  which is a luxury property owned by Ocean Properties.  It's

9  very close to Key West.

10       The Palm Beach County Commission decided to build a

11 convention center, and at the same time they decided to build

12 a convention center they wanted to build a hotel to service

13 the convention center.  Unfortunately, the convention center

14 got built without the hotel getting built at the same time,

15 and the citizens of Palm Beach County were frustrated as well

16 as the county commissioners were frustrated in their

17 inability to get a hotel built.  That frustration probably

18 continues through today.

19       In late 2003 the Board of County Commissioners

20 decided to issue an RFP, a request for proposal, to be

21 administered by Palm Beach County staff to seek bidders to

22 construct this convention center hotel.  The responses to the

23 RFP were due on or about January 26, 2004.  There were five

24 bidders, including Ocean Properties.  On June 1, 2004, the

25 Board of County Commissioners, including Defendant McCarty,

1    voted for Ocean Properties as the winning bidder.

2              As the process evolved from 2003 through 2007,

3    there were multiple votes by the County Commission involving

4    the contract, the changes to the contract, many things that

5    involved Ocean Properties' obligations to perform that

6    contract.  All came before the County Commission, and the

7    defendant voted many times on those matters.  Each time she

8    voted she failed to disclose a personal relationship that she

9    had with Ocean Properties that began at least as early as

10   2000.

11             That relationship involved members of Ocean

12   Properties who lived in Delray Beach, including a family that

13   owned it, as well as their executive vice president.  The

14   executive vice president of Ocean Properties came from a Palm

15   Beach County family that had owned significant land in what

16   is now known as the Agricultural Reserve.  In June 2000

17   the -- prior to 2000 the citizens of Palm Beach County voted

18   to do a $150 million bond to purchase land within the

19   Agricultural Reserve to preserve that land from development

20   and promote agricultural endeavors.  A 627-acre tract of land

21   within the Agricultural Reserve was owned by the family of

22   the executive vice president of Ocean Properties.  And in

23   around July of 2000 the County Commission, including the

24   defendant, voted to partner with the South Florida Water

25   Management District to give approximately $23 million in

1    taxpayer money to that family for that land.  During those

2    votes, again Commissioner McCarty failed to disclose her

3    relationship with that executive vice president, that family,

4    and Ocean Properties.

5            The facts would show that beginning as early as

6    December of 2000 and continuing until at least January of

7    2007 the executive vice president and other representatives

8    of Ocean Properties bestowed significant and material gifts

9    and gratuities on multiple occasions to Commissioner McCarty,

10   her husband, her coconspirators, her friends, and her family.

11   Those gifts and gratuities included free lodging or,

12   actually, ridiculously discounted room rates not available to

13   the general public at Sunset Key Guest Cottages and at other

14   Ocean Properties hotels, including the Delray Beach Marriott.

15           Prior to 2008 she intentionally failed to report

16   those gratuities to the State of Florida or the public.  For

17   example, your Honor, the United States would prove that

18   Sunset Key Guest Cottages, a night at those places, at the

19   cottages there is approximately $1,000 a night.  Commissioner

20   McCarty enjoyed stays there for free or rates that were

21   approximately $100 a night when she was there.  Those

22   rates -- the free lodging and those rates were not available

23   to the general public.  She failed to disclose them not only

24   on required State of Florida disclosure forms but also to the

25   public when she was voting on multiple occasions whether to

1    award the executive vice president's family money for the

2    Agricultural Reserve land or voting for Ocean Properties on

3    multiple occasions with respect to their bidding and their

4    contract with respect to building the convention center

5    hotel.

6            One of her coconspirators was a former commissioner

7    by the name of Warren Newell.  Mr. Newell has been prosecuted

8    and convicted.  Mr. Newell also enjoyed the same gratuities

9    from Ocean Properties, their executive vice president, and

10   the family on multiple occasions.  And both Commissioner

11   McCarty and Warren Newell knew that each other was receiving

12   these gifts.  In fact, the evidence would show that they

13   agreed not to disclose the receipt of these gifts.  Further,

14   these gifts were bestowed on other elected officials here in

15   Palm Beach County as well as elected officials in other

16   places within the Southern District of Florida where Ocean

17   Properties was bidding for building hotels.

18           The United States would finally prove that in order

19   to conceal her tainted and illegal votes, Commissioner

20   McCarty failed to require (sic), as I stated, the proper gift

21   disclosure forms with the State of Florida, failed to

22   disclose the true nature of her financial interest in her

23   husband's bond underwriting business, intentionally failed to

24   follow required State of Florida conflict forms, and agreed

25   with her coconspirator to intentionally ignore state

1    disclosure requirements ultimately falsely reporting to the

2    public and other county employees the true nature of a

3    material financial gratuities bestowed on her by

4    representatives of Ocean Properties.

5         Finally, Commissioner McCarty made materially false

6    statements to federal investigators regarding her true

7    financial relationship with Ocean Properties and the nature

8    and extent of the material gratuities bestowed on her by

9    persons at Ocean Properties.

10        As a result of all of these schemes, your Honor,

11   the United States would prove that the defendant profited

12   approximately $272,000.  The defendant has agreed to forfeit

13   that money, has in fact -- has transferred that money to the

14   escrow account of her husband's attorney.

15        The United States would prove all of these events

16   took place here in the Southern District of Florida.

17        Thank you.

18        THE COURT:  Thank you.

19        Ms. McCarty, you heard the prosecutor describe what

20   he would prove at trial.  Did you do that?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  How do you plead to the charge:  Guilty

23   or not guilty?

24        THE DEFENDANT:  Guilty.

25        THE COURT:  Mr. Kastrenakes, is there anything else

```
 1    you believe I should cover?

 2              MR. KASTRENAKES:  No, your Honor.  Thank you.

 3              THE COURT:  Mr. Bogenschutz, anything further?

 4              MR. BOGENSCHUTZ:  No, your Honor.

 5              THE COURT:  It's then the finding of the Court in

 6    the case of the United States versus Mary McCarty that the

 7    defendant is fully competent and capable of entering an

 8    informed plea, that she is aware of the nature of the charges

 9    and the consequences of the plea, and that the plea of guilty

10    is a knowing and voluntary plea supported by an independent

11    basis in fact containing each of the essential elements of

12    the offense.  The plea is, therefore, accepted and the

13    defendant is adjudged guilty of this offense.

14              Ms. McCarty, the probation office will do an

15    investigation.  They'll ask to speak to you.  You have a

16    right to have your lawyer present when you talk to them.

17    They will prepare a written report which will describe this

18    crime and recommend how the advisory sentencing guidelines

19    ought to be applied.  If there's anything you believe to be

20    incorrect in the report, you and your lawyer can file written

21    objections.  If those are not worked out with the Government,

22    we will decide those at the sentencing hearing.  And you will

23    have a right to address the Court with respect to sentence.

24              Do you understand?

25              THE DEFENDANT:  Yes, sir.
```

```
 1              THE COURT:  When can we have sentencing?

 2              THE COURTROOM DEPUTY:  June 4th at 10:30.

 3              THE COURT:  June 4th at 10:30.  Is that time

 4   acceptable?

 5              MR. BOGENSCHUTZ:  It is for the defense, your

 6   Honor.

 7              MR. KASTRENAKES:  Right now it is, your Honor.  I

 8   have a child that's graduating from law school, and I think

 9   that occurs in May.  So I think I'm available on that date.

10              THE COURT:  All right.  If a conflict arises, let

11   us know.

12              MR. KASTRENAKES:  Yes, sir.

13              THE COURT:  Otherwise June 4th at 10:30.

14              I note the defendant is on bond.  Should that

15   condition remain in effect?

16              MR. KASTRENAKES:  We have no objection to

17   continuing the defendant on the same conditions of bond, your

18   Honor.

19              THE COURT:  All right.  The existing conditions

20   will remain in effect.

21              Anything else today?

22              MR. KASTRENAKES:  Not from the United States.

23              MR. BOGENSCHUTZ:  Not from the defense, your Honor.

24              THE COURT:  All right.  Thank you all.

25         (Proceedings concluded at 10:55 a.m.)
```

1               C E R T I F I C A T E

2       I, Karl Shires, Registered Professional Reporter, certify

3   that the foregoing is a correct transcript from the record of

4   proceedings in the above-entitled matter.

5       Dated this 27th day of May, 2009.

6

7   _____

8   Karl Shires, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25